# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

**JUSTIN NELSON**, *individually, and on behalf of all others similarly situated*,

    Plaintiff,

**v.**

**OVERBROOK LIFE LLC**,

    Defendant.

**Case No. 1:26-cv-00374-TDS-LPA**

## DEFENDANT OVERBROOK LIFE LLC'S
## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO TRANSFER AND, IN THE ALTERNATIVE, MOTION TO DISMISS

Pursuant to Local Rule 7.3(a), Defendant Overbrook Life LLC ("Overbrook"), by counsel, submits this Memorandum of Law in support of its Motion to Transfer and, in the alternative, Motion to Dismiss.

## I.    THE NATURE OF THIS MATTER

This Nelson Family Telephone Consumer Protection Act ("TCPA") case should be transferred to the Eastern District of Michigan ("E.D. Mich.") where all the key witnesses live who can tell us who actually controls the phone number at issue that keeps generating TCPA lawsuits. Alternatively, it should be dismissed for lack of standing, lack of a viable private right of action, and/or Plaintiff's failure to plausibly plead a necessary element of his TCPA claim.

Plaintiff has filed this TCPA case under 47 U.S.C. § 227(c)(5), premised on alleged violations of the FCC's Do-Not-Call regulations, 47 C.F.R. § 64.1200(c)(2)

1

("DNC claim"). *See generally* Complaint, Dkt. No. 1. Plaintiff alleges that his supposed telephone number, 517-769-XXXX, which was on the National Do Not Call Registry ("NDNCR"), *id.* ¶¶ 12, 19, received unsolicited marketing text messages from Overbrook. *Id.* ¶¶ 20-31; *see* 47 C.F.R. § 64.1200(c)(2) (prohibiting telephone solicitations to "residential telephone subscriber[s]" that have registered their number on the NDNCR).

Overbrook first seeks to transfer this case to the E.D. Mich. because the necessary witnesses and information for answering the following dispositive issues are there:

1. Was 517-769-XXXX Plaintiff's number in November 2025, such that he was the recipient of Overbrook's texts?

2. Did Plaintiff, or someone he authorized, through a November 6, 2025 opt-in, (a) agree to arbitrate his DNC claim, and (b) consent to Overbrook texting 517-769-XXXX?

3. Was 517-769-XXXX used as a business number when it received Overbrook's texts?

Alternatively, Overbrook moves to dismiss Plaintiff's claims for the following reasons:

1. Given contradictory allegations the Nelsons have made in their other TCPA cases, Plaintiff cannot establish that 517-769-XXXX is *his* number and that *he* received Overbrook's texts, which is necessary for Article III standing.

2

2. 517-769-XXXX was a business number when it received Overbrook's texts. 47 C.F.R. § 64.1200(c)(2)'s protections do not apply to business numbers.

3. There is no private right of action under Subsection 227(c)(5) for the receipt of text messages because they are not "telephone calls."

4. Plaintiff failed to plausibly plead that he, or someone at his direction, personally registered 517-769-XXXX on the NDNCR..

## II.    QUESTIONS PRESENTED

Regarding the Motion to Transfer: Whether the convenience of the parties and witnesses, and the interests of justice, favor transfer of this case to the E.D. Mich.

Regarding the Motion to Dismiss:

1.      Whether Plaintiff has Article III standing if 517-769-XXXX is not his number and he did not receive Overbrook's texts.

2.      Whether Plaintiff has Article III standing if 517-769-XXXX was used as a business number when it received Overbrook's text messages.

3.      Whether Congress's private right of action for receipt of certain "telephone calls" be expanded to cover text messages.

4.      Whether a plaintiff's personal registration of the recipient number on the NDNCR is a necessary element of a DNC claim.

## III.   STATEMENT OF FACTS

### A.   The Nelsons' Foray Into the TCPA Litigation Business and Alleged Association With 517-769-XXXX

Plaintiff is married to Michele Nelson.[1] The Nelsons, who reside in Jackson, Michigan,[2] began filing TCPA cases in January 2026, with Mrs. Nelson filing the first two.[3] There she alleged that, since June of 2025, **she** is "the subscriber of" 517-769-XXXX. Exhibit A ¶ 8. She also alleged that **she** "**does not have any other telephone numbers**," **she** has never associated 517-769-XXXX with or used it for a business, **she** pays for the associated plan, and **her** "number has been registered with the [NDNCR] since November" 2024. *Id*. ¶¶ 12-16 (emphasis added).

Plaintiff began filing his own TCPA cases in February 2026, which now total ten.[4] He has directly contradicted his wife's allegations in eight of his cases by alleging that, since June 2025, **he** is "the subscriber of" 517-769-XXXX, **he** pays for the associated plan, and **his** "number has been registered with the [NDNCR] since November" 2024. Exhibit C ¶¶ 10, 14, 17.[5]

---

[1] *See* Exhibit V (Mrs. Nelson, in an Instagram post, referring to Plaintiff as "[m]y husband").

[2] *See* Exhibit I ¶ 3 (Plaintiff "resides in Jackson, Michigan."); *see also* Exhibit A ¶ 6 (Mrs. Nelson resides in the E.D. Mich.).

[3] *See* Exhibits A-B (Mrs. Nelson's TCPA Complaints).

[4] *See* Exhibits C-K (Plaintiff's other TCPA Complaints).

[5] *See also* Exhibits D-F ¶¶ 9, 13, 16; Exhibit I ¶¶ 9, 13, 16; Exhibit J ¶¶ 15, 19, 22; Exhibit K ¶¶ 23, 27, 30; Compl. ¶¶ 12, 16, 19.

4

Plaintiff alleged in his first case that his wife is the user of 517-769-XXXX.[6] Then in six of his more recent cases involving 517-769-XXXX, Plaintiff has omitted any reference to his wife and just refers generally to "the telephone number" without reference to a specific user. Compl. ¶ 13.[7] Only one of Plaintiff's recent complaints alleges his use of 517-769-XXXX, directly contradicting his wife's allegations.[8] Every one of Plaintiff's cases contradicts his wife's other 517-769-XXXX-related allegations by alleging how **he** did not use that number for business purposes and when **his** telephone number was registered on the NDNCR.[9]

Plaintiff has also filed two TCPA cases concerning another phone number, 517-750-XXXX, that he claims is **his** number. *See* Exhibit G ¶ 9 (Plaintiff "is the subscriber of" 517-750-XXXX."); *see also* Exhibit H ¶ 16 ("Plaintiff primarily uses [517-750-XXXX] to communicate with friends and family[.]"). 517-750-XXXX being Plaintiff's number may explain Mrs. Nelson's allegation that she "does not have any other telephone

---

[6] *See* Exhibit C ¶¶ 11-13 (alleging that "**Plaintiff's Spouse** uses" 517-769-XXXX (emphasis added)).

[7] *Id*. ¶¶ 13-15 ("**The telephone number** is used as a personal residential telephone number. **It** is used for personal use only[.] . . . **It** is used primarily to communicate with friends and family[.]" (emphasis added)); *see also* Exhibits D-F ¶¶ 10-12; Exhibit J ¶¶ 16-18; Exhibit K ¶¶ 24-26.

[8] Exhibit I ¶¶ 10-12 ("The telephone number was **used by Plaintiff** as a personal residential telephone number. **Plaintiff uses the cell phone number** for personal use[.] . . . **Plaintiff uses the cell phone** primarily to communicate with friends and family[.]" (emphasis added)).

[9] *See* Exhibit C ¶¶ 15-16 ("**Plaintiff** has never had this [] number associated with a business. **Plaintiff** has never used this [] number in any business" (emphasis added)); Exhibits D-F ¶¶ 14-15; Exhibit I ¶¶ 14-15; Exhibit J ¶¶ 20-21; Exhibit K ¶¶ 28-29; Compl. ¶ 17-18.

numbers" besides 517-769-XXXX, Exhibit A ¶ 12, but cannot explain how 517-769-XXXX is both their mobile number.

**B.     The Calls and Text Messages At Issue in the Nelsons' Cases**

The Nelsons' cases concerning 517-769-XXXX are all premised on that number's receipt of calls and/or texts messages that allegedly violated the TCPA, which allegedly occurred between August 2025 and April 2026. *See generally* Exhibits A-F, I-K.

In five of the Nelsons' cases, the calls and/or texts at issue mentioned "Annette," "Anette," and/or "Annett." *See* Exhibit A ¶¶ 17-18 (October 2025 to January 2026 text messages began with "Annette"); Exhibit B ¶¶ 18-34 (September-to-December 2025 calls to "Anette" and "Annett"); Exhibit C ¶¶ 18, 20 (text messages until December 2025 about "Social Assistance for Annette"); Exhibit I ¶¶ 17-18, 20 (text messages until March 2026 began with "Hi Annette").

**C.     Annette Ostrander's Association With 517-769-XXXX**

Ms. Ostrander also was or is the user of 517-769-XXXX. *See* Exhibit L. Like the Nelsons, she is a resident of Jackson, Michigan. *See* Exhibit M. As demonstrated above, multiple entities attempted to contact her at 517-769-XXXX between October 2025 and March 2026.

In *Whaleco*, Plaintiff alleged that "in December of 2025 and January of 2026," 517-769-XXXX received text messages from 517-962-3724. Exhibit F ¶¶ 17-18. 517-962-3724 is associated with Lisa and Richard Rice, a married couple also residing in Jackson, Michigan. *See* Exhibits N-P. Mrs. Rice and Ms. Ostrander are friends on

6

Facebook. *See* Exhibits Q-S. Thus, as recently as January 2026, Ms. Ostrander's own friend was trying to contact her through 517-769-XXXX, despite the Nelsons' claim that one or both of them have been using it since June 2025.

**D.    The Opt-in Consenting to Overbrook Texting 517-769-XXXX**

Overbrook provides interested consumers with information concerning money-saving resources and promotional deals. *See* Declaration of Blaine Beichler ¶ 5, attached as Exhibit T. Overbrook has partnered with ScoredIt to identify consumers interested in and who consent to receive information and offers from ScoredIt and its third-party marketing partners, like Overbrook. *Id*. ScoredIt secures its website visitors' consent to receive calls and text messages from it and its third-party marketers, including Overbrook. *Id*. ¶ 6.

On November 6, 2025, *some five months after* the Nelsons claim to have become 517-769-XXXX's owner,[10] Plaintiff or another user of 517-769-XXXX visited ScoredIt's website and completed its marketing-messages opt-in process. *Id*. ¶¶ 10-11. Through that process, they consented to receive Overbrook's text messages and agreed to ScoredIt's Terms of Use ("Terms"). *Id*.  Specifically, on November 6, 2025, Plaintiff or another user of 517-769-XXXX proceeded through seven different screens and entered various

---

[10] The FCC's "number-aging" rules—essentially, how long a prior user's relinquished phone number must remain unassigned before the carrier can reassign it to the next user—require carriers to age residential numbers for a minimum of 45 days but not more than 90 days.  *See* 47 C.F.R. § 52.15(f)(ii).

information. *Id.* ¶¶ 39-41. That information included Ms. Ostrander's first and last name, a Jackson, Michigan address, and 517-769-XXXX. *Id.* ¶ 41.

During the visit to ScoredIt's website, Plaintiff or another user of 517-769-XXXX was presented with a screen that prompted them to enter their phone number and gave them the option to check a consent box and click "Continue," thereby agreeing to the Terms. *Id.* ¶ 22. The language by the consent box stated: "By selecting this box and clicking 'Continue,' I . . .consent to receive calls and SMS text messages from . . . Unified Marketing Partners, and its subsidiaries[.] . . . I agree to the [] Terms of Service(including dispute resolution via arbitration and waiver of class actions)." *Id.*

The phrase "subsidiaries" was a blue hyperlink to a page listing Overbrook. *Id.* ¶ 26. That page states that the consenting consumer acknowledges and agrees that Overbrook may enforce ScoredIt's Terms' "**mandatory arbitration** and **waiver of class action lawsuits**" provisions. *Id.*

The user entered the telephone number 517-769-XXXX, checked the consent box, and clicked "Continue." *Id.* ¶ 40. In doing so, they agreed to ScoredIt's Terms, including its mandatory-arbitration clause, and consented to receive marketing text messages from Overbrook. *Id.* ¶¶ 22, 26. They could read the Terms in full by simply clicking the phrase "Terms of Service," which was a blue hyperlink to the Terms. *Id* ¶ 28.

The Terms state on the first page: "YOU AGREE TO MANDATORY ARBITRATION AND WAIVER OF THE ABILITY TO BRING A CLAIM IN A CLASS ACTION FORMAT." *Id.* ¶ 33. The binding arbitration section of the Terms state: "**All**

**disputes or claims arising out of or relating to these Terms of Service or your use of the Site must be resolved by final and binding arbitration**.” *Id*. ¶ 34. The Terms further state that “‘Our Companies’[] can claim any rights under” the Terms. *Id*. ¶ 36. “Our Companies” is defined to include ScoredIt’s “unaffiliated companies[] . . . and brands that are . . . partnering with ScoredIt[,]” such as Overbrook. *Id*.

Overbrook sent the text messages at issue pursuant to that November 6, 2025 opt-in. *Id*. ¶¶ 39-40, 43.

E.      The Business Use of 517-769-XXXX

Jackson County Hands United (“JCHU”) is a Michigan corporation. *See* Exhibit U. Mrs. Nelson is JCHU’s Executive Director/CEO and Plaintiff is its Treasurer. *See* Exhibits U-V. JCHU was operating in November 2025. *See* Exhibits V-X. In September 2025, Mrs. Nelson advertised branded T-shirts for JCHU that listed 517-769-XXXX as its telephone number. *See* Exhibits Y-Z. 517-769-XXXX was also listed as JCHU’s telephone number online. *See* Exhibit AA.

On or around April 7, 2026, Plaintiff’s counsel was made aware of this by an attorney representing another party in a suit by Plaintiff in the United States District Court for the District of Massachusetts. *See* Exhibit BB. Thereafter, 517-769-XXXX was removed from an online JCHU listing. *See* Exhibit CC. On May 13, 2026, Mrs. Nelson posted online that she got a new number for JCHU. *See* Exhibit DD.

9

## IV.  THIS MATTER SHOULD BE TRANSFERRED TO THE E.D. MICH.

A court "may transfer an action to another district . . . if three requirements are met: (1) the action originally could have been brought in the transferee court; (2) a transfer serves the convenience of the witnesses and parties; and (3) a transfer serves the interests of justice." *Gemini Drilling & Found., LLC v. Balfour Beatty Constr., Inc.*, CIVIL NO. 1:03CV00999, 2004 U.S. Dist. LEXIS 5300, at *2 (M.D.N.C. Feb. 20, 2004) (citing 28 U.S.C. § 1404(a)). Factors a court should consider when deciding a motion to transfer venue include the "relative ease of access to sources of proof; . . . availability of compulsory process for attendance of unwilling witnesses, and the cost of obtaining attendance of willing and unwilling witnesses; . . . practical problems that make a trial easy, expeditious, and inexpensive; . . . [and] local interest in having localized controversies settled at home[.]" *Speed Trac Techs., Inc. v. Estes Express Lines, Inc.*, 567 F. Supp. 2d 799, 802 (M.D.N.C. 2008) (citation omitted).

Taking those requirements in reverse order, this matter should be transferred to the E.D. Mich. because (1) it would serve the interest of justice and the convenience of the witnesses and parties due to the relevant information and witnesses for four fully dispositive issues being located within that district and (2) this action could have originally been brought there.

**A.  Transferring this Matter to the E.D. Mich. Would Serve the Interests of Justice and the Convenience of Witnesses and the Parties.**

There are four separate, dispositive questions here:

(1)     The owner of telephone number 517-769-XXXX—whether Plaintiff, Mrs. Nelson, or Ms. Ostrander—and, correspondingly, who received Overbrook's texts. Plaintiff lacks standing if he was not the recipient. *See Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 656 (4th Cir. 2019) (recognizing that Subsection 227(c)(5) provides a private right of action to the "'person' who 'received'" the calls). The Nelsons' allegations in their prior cases, *see supra* III.A., raise substantial questions as to who is the subscriber and/or user of 517-769-XXXX, and thus who actually received Overbrook's text messages.

(2)     Whether Plaintiff agreed to arbitrate his DNC claim via the November 6, 2025 opt-in. If he did, his claim must be compelled to arbitration. The information provided as part of that opt-in relates to Ms. Ostrander. *See supra* III.D. But Ms. Ostrander has an association with 517-769-XXXX. *See supra* III.C. As the Nelsons and Ms. Ostrander reside in the same small town, it is at least plausible that there is a connection between them through which Plaintiff is responsible for the November 6, 2025 opt-in.[11]

(3)     Whether Plaintiff consented to Overbrook texting 517-769-XXXX via the November 6, 2025 opt-in. If so, his claim fails. *See Danehy v. Time Warner Cable*

---

[11] According to the FCC's most recent statistics, there were approximately 1.7 million phone numbers assigned or awaiting assignment to wireless subscribers with a 517 area code. *See* https://docs.fcc.gov/public/attachments/DA-26-321A1.pdf (FCC's Numbering Utilization Report for March 2026; Table 7, Page 21, at row Area Code 517). Jackson, Michigan is a small town with roughly 30,000 total residents, a tiny fraction of the roughly 1.8 million people living in the 517 area code. The odds that the same wireless number changed hands *within* the same small town by sheer coincidence is small.

*Enters.*, No. 5:14-CV-133-FL, 2015 U.S. Dist. LEXIS 125325, at *18-19 (E.D.N.C. Aug. 6, 2015) *adopted by* No. 5:14-CV-133-FL, 2015 U.S. Dist. LEXIS 125053 (E.D.N.C. Sept. 18, 2015) (recognizing that calls made with consent are exempt from 64.1200(c)(2)).

(4)    Whether 517-769-XXXX a business number used by JCHU. If so, Plaintiff's claim fails. *See Worsham v. Disc. Power, Inc.*, Civil Action No. RDB-20-0008, 2021 U.S. Dist. LEXIS 1931, at *11-12 (D. Md. Jan. 6, 2021) (dismissing a DNC claim because the plaintiff's number was "a business phone number," and 64.1200(c)(2) does not prohibit "business-to-business calls." (citation omitted)). There is significant evidence that 517-769-XXXX was a business number at the time it received Overbrook's text messages. *See supra* III.E.

The witnesses (Mrs. Nelson, Ms. Ostrander, and Ms. Price) and information necessary to answer these questions are located in the E.D. Mich. Plaintiff himself resides there and has two pending TCPA claims there. He will not be inconvenienced by this transfer. Further, the E.D. Mich. has an interest in resolving this matter, as it involves allegedly unlawful texts sent into that district. The convenience of the parties and witnesses and the interest of justice will all be served by transferring this case to the E.D. Mich.

**B.     This Matter Could Have Originally Been Brought in the E.D. Mich.**

A matter could have originally been brought in "the transferee court" when it "has subject matter jurisdiction, proper venue, and personal jurisdiction over the parties." *Balfour Beatty Constr.*, 2004 U.S. Dist. LEXIS 5300, at *2 (citation omitted).

The E.D. Mich. has subject matter jurisdiction over this matter because it is a federal claim. *See* 28 U.S.C. § 1331.

Specific personal "jurisdiction exists when a defendant . . . sends a message into the forum state by targeting a telephone number within the particular forum." *Mey v. All Access Telecom, Inc.*, Civil Action No. 5:19-cv-00237-JPB, 2021 U.S. Dist. LEXIS 80018, at *8 (N.D. W. Va. Apr. 23, 2021) (collecting cases). Here, the E.D. Mich. has personal jurisdiction because Plaintiff, an E.D. Mich. resident, alleges that Overbrook sent texts to 517-769-XXXX. Compl. ¶¶ 9, 20. 517 is an area code in the E.D. Mich. *See Supra* n.11.

Venue is proper within the E.D. Mich. for the same reason. *See Dores v. One Main Fin.*, Civil No. 1:15-cv-01609-LO-MSN, 2016 U.S. Dist. LEXIS 81913, at *2 (E.D. Va. June 1, 2026) (finding venue in a TCPA case to be proper in the district where the plaintiff resided and received the calls at issue).

**C.     Plaintiff's Choice of Forum is of Little or No Consideration.**

A plaintiff's choice of forum is typically "entitled to respect and deference[.]" *Davis v. Stadion Money Mgmt., LLC*, 1:19CV119, 2019 U.S. Dist. LEXIS 218959, at *8 (M.D.N.C. Dec. 20, 2019) (citation modified). But such deference is diminished when, as

13

here, the plaintiff seeks to serve as "the representative in a class action." *Id*. (citation omitted). That deference "is further diminished when the plaintiff's choice of forum has little connection to the action." *Id*. at *9. This District has no connection to this matter other than Overbrook being a North Carolina limited liability company. *See* Beichler Decl. ¶ 4. Overbrook primarily operates in Florida. *Id*.  It sent texts to 517-769-XXXX from Florida. *Id*. ¶¶ 44-45. The person overseeing Overbrook's texting campaigns is located in Florida. *Id*. ¶ 2. Overbrook's relevant business records are stored digitally from Florida. *Id*. ¶ 46. Therefore, no deference should be given to Plaintiff's selection of this District. This matter should be transferred to the E.D. Mich.

III. **ALTERNATIVELY, THIS MATTER SHOULD BE DISMISSED DUE TO PLAINTIFF'S LACK OF STANDING AND FAILURE TO STATE A CLAIM.**

A. **Plaintiff Did Not Suffer an Injury-in-Fact From 517-769-XXXX's Receipt of Overbrook's Texts.**

A plaintiff must have Article III standing for a district court to have subject matter jurisdiction over his claim. *See Mullinax v. Radian Guar., Inc.*, 311 F. Supp. 2d 474, 480 (M.D.N.C. 2004). Suffering an injury in fact is a necessary element of Article III standing. *See 24th Senatorial Dist. Republican Comm. v. Alcorn*, 820 F.3d 624, 628 (4th Cir. 2016).

Plaintiff cannot establish Article III standing for his DNC claim because he did not suffer an injury-in-fact from 517-769-XXXX's receipt of Overbrook's texts. Specifically, 517-769-XXXX was a business number and not Plaintiff's number when it received

Overbrook's text messages. Thus, the Court lacks subject matter jurisdiction over Plaintiff's DNC claim and should dismiss it.

### 1. Plaintiff Was Not the Recipient of Overbrook's Text Messages.

Subsection 227(c)(5) only provides a private right of action to a "person who has **received** more than one [Subsection 227(c)-violating] telephone call within any 12-month period by or on behalf of the same entity[.]" (emphasis added).

Plaintiff's Complaint never alleges that he received Overbrook's text messages. Instead, he merely alleges that Overbrook delivered text messages to 517-769-XXXX. *See* Compl. ¶ 20. That alone establishes that Plaintiff lacks the right to bring a DNC claim here. Plaintiff's decision to omit such an allegation was deliberate, and his likely reasoning for doing so, addressed below, demonstrates why he was not the recipient of or injured by those text messages.

Plaintiff's cellular telephone number since June 2025 is, and has been, 517-750-XXXX. *See supra* III.A. The Nelsons have not pled any contradictory allegations regarding that fact.

Meanwhile, the Nelsons' conflicting stories regarding 517-769-XXXX's owner have changed over the past six months and now directly contradict Mrs. Nelson's allegations in her cases and Plaintiff's own allegations in the complaint in *Nelson v. Adwora* (E.D. Mich.). *Compare* Exhibit A ¶¶ 8-16; Exhibit B ¶¶ 15, 18; Exhibit C ¶¶ 10-17; *with* Exhibits D-F ¶¶ 9-16; Exhibit I ¶¶ 9-16; Exhibit J ¶¶ 15-22; Exhibit ¶¶ 23-30. In those cases, the Nelsons alleged that 517-769-XXXX is Mrs. Nelson's number. *Id*. That

makes sense if 517-750-XXXX is Plaintiff's number and given Mrs. Nelson's allegation that she does not have any other telephone numbers. *See* Exhibit A ¶ 12. But in every one of his cases since *Adwora* that involves 517-769-XXXX, Plaintiff has contradictorily alleged that 517-769-XXXX is his number, while carefully avoiding pleading that **he** received the relevant calls made or texts sent to 517-769-XXXX. *See supra* III.A. That is presumably because Plaintiff knows that 517-769-XXXX, assuming it was actually even controlled and used by either of the Nelsons since June 2025, is Mrs. Nelson's number. She, not Plaintiff, would have received Overbrook's texts to 517-769-XXXX if their other allegations are true.

But whether 517-769-XXXX is even Mrs. Nelson's number is called into question due to Ms. Ostrander's association with that number. *See supra* III.B-C. As discussed above, as recently as March 2026, persons have been calling and texting 517-769-XXXX to contact Ms. Ostrander, including her friend. *See supra* III.C. If Ms. Ostrander's association with 517-769-XXXX ended in, or prior to June 2025, presumably her friend in the same small town would know that and would not still be trying to reach her through that number **several months later**.

At best, Plaintiff is suing over text messages Mrs. Nelson received on a telephone number for which she is both the subscriber and user. At worst, neither Nelson received them, and Ms. Ostrander received the texts she signed up for. In either case, any injury resulting from those text messages was not suffered by Plaintiff. Accordingly, he lacks

Article III standing and this Court lacks subject matter jurisdiction here. Plaintiff's claim should be dismissed.

### 2. 517-769-XXXX was a Business Number.

In November 2025, as represented by Mrs. Nelson on t-shirts and online, 517-769-XXXX was JCHU's telephone number. *See supra* III.E. Thus, 517-769-XXXX was a business number when it received Overbrook's texts. 517-769-XXXX was not subject to the protections of 64.1200(c)(2) because it "does not apply to business telephone numbers." *See Mattson v. New Penn Fin.*, No. 3:18-cv-00990-YY, 2020 U.S. Dist. LEXIS 197955, at \*2 (D. Or. Oct. 25, 2020) (citation omitted); *see also In Re Rules & Regs. Implementing the TCPA*, 23 F.C.C. Rcd. 9779, 9785 (June 17, 2008) (The NDNCR "does not preclude calls to businesses."). Therefore, even if 517-769-XXXX was Plaintiff's number in November 2025 and he received Overbrook's texts, he did not suffer an injury-in-fact because those texts were not unlawful. Accordingly, he lacks Article III standing for his DNC claim. *See Shelton v. Target Advance LLC*, CIVIL ACTION NO. 18-2070, 2019 U.S. Dist. LEXIS 64713, at \*15-18 (E.D. Pa. Apr. 16, 2019) (dismissing plaintiff's DNC claim for lack of Article III standing because he did not suffer "an injury-in-fact by way of receiving business-to-business [calls] on a [business] phone number he registered on the" NDNCR).[12]  Thus, the Court lacks subject matter jurisdiction over Plaintiff's DNC claim and should dismiss it.

---

[12] *See also Worsham v. Disc. Power, Inc.*, Civil Action No. RDB-20-0008, 2021 U.S. Dist. LEXIS 1931, at \*10 (D. Md. Jan. 6, 2021) (granting defendant's motion to dismiss a DNC claim because, regardless of "whether the . . . number is primarily used by

## B. Subsection 227(c)(5)'s Private Right of Action Does Not Apply to Text Messages.[13]

Although Congress did not define "telephone call" in the TCPA, when the statute was enacted in 1991, the term carried a well-understood, ordinary meaning. *See Niz-Chaves v. Garland*, 593 U.S. 155, 160 (2021) (courts interpret statutory terms according to their "ordinary meaning at the time Congress adopted them"). Congress had no need to give "telephone call" any special definition because it had been an everyday experience of Americans for a century. A telephone call involved—and still involves—a phone ringing and a voice connection. There was no written text exchanged by telephone call in

---

[plaintiff] for residential purposes, the number is also used for business, and business numbers are not permitted to be registered on the [NDNCR].") (citation omitted).

[13] Following the Supreme Court's recent holding that Courts must "independently—and without any special deference to an agency interpretation—determine a statute's meaning," *Stockdale v. Skymount Prop. Grp., LLC et. al.*, Case No. 1:25-cv-1282, 2026 U.S. Dist. LEXIS 42954, at *5 (N.D. Ohio Mar. 3, 2026) (citing *McLauglin Chiropractic Assocs. v. McKesson Corp.*, 606 U.S. 146, 155 (2025)), courts across the country have dismissed TCPA claims because the term "telephone call" in Subsection 227(c)(5) does not include text messages and thus there is no private right of action for text messages under that subsection. *See, e.g.*, *Radvansky v. Kendo Holdings, Inc.*, Case No. 3:23-cv-00214-LMM, 2026 U.S. Dist. LEXIS 65154 (N.D. Ga. Feb. 12, 2026) (finding that a text message is not a telephone call under Subsection 227(c)(5)); *James v. Smarter Contact, Inc.*, Case No. 8:25-cv-1657-KKM-SPF, 2026 U.S. Dist. LEXIS 68492 (M.D. Fla. Mar. 31, 2026) (dismissing claim because "telephone call" within Subsection 227(c)(5) of the TCPA does not include text messages); *Richards v. Fashion Nova*, Case No. 1:25-cv-01145-TWP-MKK, 2026 U.S. Dist. LEXIS 65696 (S.D. Ind. Mar. 26, 2026) (finding text message is not a "telephone call" under Subsection 227(c)(5)); *Stockdale*, 2026 U.S. Dist. LEXIS 42954 (holding "telephone call" in Subsection 227(c)(5) does not encompass text messages); *Radvansky v. 1-800-FLOWERS.COM*, Case No. 1:25-cv-2811-TWT, 2026 U.S. Dist. LEXIS 32415 (N.D. Ga. Feb. 17, 2026) (dismissing claim because Subsection 227(c)(5) does not include text messages); *El Sayed v. Naturopathica Holistic Health, Inc.*, Case No. 8:25-cv-00846-SDM-CPT, 2025 U.S. Dist. LEXIS 209469 (M.D. Fla. Oct. 24, 2025) (same); *Jones v. Blackstone Med. Servs., LLC*, 792 F. Supp. 3d 894 (C.D. Ill. 2025) (same).

1991. Cell phones were not yet in widespread use, and commercially available text-message services would not emerge for nearly another decade. It would be a strained and historically inaccurate reading to assume that when Congress referred to "telephone calls" in 1991, it was implicitly addressing "text messages" too.

As several courts have recognized, text messaging was not an available technology in 1991, and thus "telephone call" would not have included text messages when Congress passed the TCPA. *See*, *e.g.*, *Jones*, 792 F. Supp. 3d at 899-900. Rather, in 1991, a "call" was defined as the "act of calling on the telephone . . . and telephone [was defined as] an instrument for reproducing sounds at a distance." *Stockdale*, 2026 U.S. Dist. LEXIS 42954, at *5 (citing Merriam-Webster New College Dictionary (9th ed. 1990)).

Thus, "a text message, which does not use a telephone to reproduce sounds at a distance, is not included or embraced in the ordinary public meaning of 'telephone call' from 1991." *James*, 2026 U.S. Dist. LEXIS 68492, at *6-7; *see also Stockdale*, 2026 U.S. Dist. LEXIS 42954, at *5 (finding "'telephone call' could not include modern-day text messages because text messages do not use a telephone to reproduce sounds at a distance"). Therefore, when Congress created a private right of action for the receipt of certain "telephone calls," the "ordinary meaning" of that phrase did not include text messages. *See James*, 2026 U.S. Dist. LEXIS 68492, at *5-6 ("When determining a statute's meaning, courts seek to afford the law's terms their ordinary meaning at the time Congress adopted them.") (citation modified). "This conclusion—supported by the

19

ordinary public meaning at the time of the provision's enactment—is enough to end [the]

case." *Davis v. CVS Pharm., Inc.*, 797 F. Supp. 3d 1270, 1273 (N.D. Fla. 2025).[14]

Further confirmation that Subsection 227(c)(5)'s "telephone call" does not encompass text messages comes from Congress's subsequent amendments, which expressly added the terms "text message" and "text messaging service" to other TCPA provisions. *See James*, 2026 U.S. Dist. LEXIS 68492, at *9-10. For instance, in 2018, Congress amended Subsection 227(e) to address caller ID manipulation and, in doing so, expressly distinguished between "a call made using a voice service" and a "text message sent using a text messaging service." 47 U.S.C. § 227(e)(8)(A)-(B). That deliberate differentiation shows that the original phrase "telephone call" did not include text messages. *See Yale New Haven Hospital v. Becerra*, 56 F.4th 9, 21 (2d Cir. 2022) ("where a statutory scheme has used one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea." (citation modified)).[15]

---

[14] Even "in today's American parlance, 'telephone call' means something entirely different from 'text message.'" *Jones*, 792 F. Supp. 3d at 899; *see also Davis,* 797 F. Supp. 3d at 1273 ("no ordinary person would think of a text message as a 'telephone call.' This conclusion—supported by the ordinary public meaning at the time of the provision's enactment—is enough to end this case."); *El Sayed*, 2025 U.S. Dist. LEXIS 209469, at *3 ("In addition to the fact that in common American English usage, a 'telephone call' and a 'text message' are separate and distinct forms of communication, the term 'text message' appears elsewhere in the TCPA and related amendments, an appearance that confirms Congress understood the pertinent distinction and legislated mindful of the distinction." (citation omitted)).

[15] Had Congress intended to include text messages within Subsection 227(c)'s private right of action, it could have amended it at any time to do so, just as several state legislatures have expressly amended their statutes to do because they recognized that

Likewise, the TCPA's overall structure confirms that Subsection 227(c)(5) does not reach text messages. Subsection 227(a)(4), for example, defines "telephone solicitation" broadly to include "the initiation of a telephone call *or message*," confirming that Congress knew how to extend the statute beyond calls when it wished to do so. 47 U.S.C. § 227(a)(4) (emphasis added). But in Subsection 227(c)(5)'s private right of action, the narrower term "telephone call" is used. *Compare* 47 U.S.C. § 227(a)(4), *with* 47 U.S.C. § 227(c)(5). That textual choice also signals that Congress did not intend Subsection 227(c)(5)'s private right of action to reach text messages. *See Davis*, 797 F. Supp. 3d at 1274 ("Congress's use of the phrase 'telephone call or message' in a neighboring provision only undermines [plaintiff's] position. It shows that Congress does not use the term 'telephone call' to encompass all 'messages.'").

Subsection 227(b) makes the same point. In Subsection 227(b)(1)(A), Congress prohibited making "any call" using specified technology to a range of numbers, including cellular telephones and paging services. That "any call" provision necessarily reaches non-voice communications: in 1991, pagers received numeric or text messages, not voice calls. By contrast, Subsection 227(b)(1)(B) prohibits "any *telephone call* to any residential *telephone line*" using an artificial or prerecorded voice—a formulation expressly tied to voice communications delivered over residential landlines, which did

---

"telephone calls" do not include texts. *See* 2019 N.C. Sess. Laws 188 (amending N.C. Gen. Stat. § 75-101(9) to define "telephone solicitation" as a "voice *or text* communication" (emphasis added)); Fla. Stat. § 501.059(1)(j) (2023) (amending "telephonic sales call" to include calls and texts); Tex. Bus. & Com. Code § 302.001 (as amended in 2025) (same).

not receive text messages. 47 U.S.C. § 227(b)(1)(B) (emphasis added). Congress thus used the broader term "any call" when addressing a broader set of communications (including messages to pagers), and the narrower term "telephone call" when addressing voice communications.

Congress also regulated fax advertising separately, prohibiting unsolicited advertisements sent to a "telephone facsimile machine," even though those transmissions occur over telephone lines. 47 U.S.C. § 227(b)(1)(C). This all bolsters the point that "telephone call" only includes voice calls. And Subsection 227(c)(5)'s private right of action is limited to receipt of "more than one telephone call." That deliberate choice must be given effect. Because Plaintiff alleges only that he received text messages, not telephone calls, he cannot invoke Subsection 227(c)(5). His claims fail as a matter of law.

The Supreme Court has warned against judicial efforts to retroactively "modernize" the TCPA by stretching terms beyond their original meaning. In *Facebook v. Duguid*, the Court unanimously reversed an expansive interpretation of the TCPA, holding that courts may not rewrite the statute to keep up with changing technology. 592 U.S. 395 (2021). The same logic applies here. If "telephone call" meant "text message," then any communication capable of being transmitted via the phone—emails, app alerts, social media notifications—could arguably fall within the statute. Congress chose not to go that far by using a term with a fixed contemporaneous meaning in Subsection

22

227(c)(5)—instead of a *category term* like "all communications"[16]—which also contains other limitations on the private cause of action not present in other subsections of the TCPA.[17]

In sum, the only plausible interpretation of Congress's private right of action in Subsection 227(c)(5) for certain "telephone calls" is that Congress meant what it said—and did not intend to silently smuggle in text messages, a yet-to-be-created form of communication. "[U]nder a plain reading, [Subsection] 227(c)(5) of the TCPA does not regulate text messages." *Jones*, 2025 U.S. Dist. LEXIS 138371, at *11. The Court's inquiry should end here. A text message is not a "telephone call" under the statute's plain language, and thus Plaintiff's Subsection 227(c)(5) claim for an entirely different type of communication fails as a matter of law.

### C. Plaintiff did not Register 517-769-XXXX on the NDNCR.

To sustain a DNC claim, the plaintiff must have been the person who registered the recipient telephone number on the NDNCR.[18] Here, Plaintiff alleges that 517-769-

---

[16] Another example of a category term is "vehicle." That would include gas cars and EVs, even if the latter did not exist when the relevant statute was enacted. But unlike a broad category term like "vehicle," "telephone call" had a specific, limited meaning when the TCPA was enacted in 1991—and continues to have that same meaning today, requiring transmission of sound.

[17] Decisions finding that "text messages" are "telephone calls" under Subsection 227(c)(5) routinely err by using the verb form of "call," as opposed to the noun form that Congress used in Subsection 227(c)(5). *See James*, 2026 U.S. Dist. LEXIS 68492, at *8-9. Those decisions then "compound the error by neglecting to consider the modifying effect on 'call' from 'telephone' as understood in 1991." *Id.* at *8.

[18] *See, e.g.*, *Klassen v. Solid Quote LLC*, 702 F. Supp. 3d 1052, 1059 (D. Colo. 2023) (finding the class definition overbroad as it failed to account for "who did the registering" of the number on the NDNCR); *Rogers v. Assur. IQ, LLC*, CASE NO. 2:21-

23

XXXX "has been registered with the [NDNCR] since November" 2024. Compl. ¶ 19. Plaintiff was not the person who registered 517-769-XXXX on the NDNCR when he did not become the subscriber of that number until "June of 2025." *Id*. ¶ 12.[19] Thus, Plaintiff fails to state a viable DNC claim.

## IV. CONCLUSION

The Court should transfer this matter to the E.D. Mich. Alternatively, it should dismiss Plaintiff's Complaint for lack of standing or, with prejudice for lack of a cognizable private right of action and for Plaintiff not having personally registered 517-769-XXXX on the NDNCR.

This the 6th day of July, 2026.

/s/ S. Wilson Quick
S. Wilson Quick
N.C. State Bar No. 47725
wquick@brookspierce.com

Michael B. Jones
N.C. State Bar No. 63595
mjones@brookspierce.com

BROOKS, PIERCE, McLENDON,

---

cv-00823-TL, 2023 U.S. Dist. LEXIS 51955, at *11-12 (W.D. Wash. Mar. 27, 2023) (dismissing plaintiffs' Subsection 227(c) claim due to the plaintiffs' deliberate use of passive voice rendering it plausible that "the numbers could have been registered by previous owners of those numbers rather than by" the plaintiffs, given that such information should have been known to the plaintiffs)**;** *Rombough v. Robert D. Smith Ins. Agency, Inc.*, No. 22-CV-15-CJW-MAR, 2022 U.S. Dist. LEXIS 124614, at *7 (N.D. Iowa June 9, 2022) (dismissing plaintiff's claim because she failed to allege "that *she* registered her telephone number on the" NDNCR).

[19] The Nelsons have never alleged that either of them registered 517-769-XXXX on the NDNCR. *See* Exhibit C ¶ 17; Exhibit D-F ¶ 16; Exhibit I ¶ 16; Exhibit J ¶ 22; Exhibit K ¶ 30; Compl. ¶ 19.

HUMPHREY & LEONARD, LLP
P.O. Box 1800
Raleigh, NC 27602
Telephone: 919-839-0300
Facsimile: 919-839-0304

*Attorneys for Defendant Overbrook Life, LLC*


## CERTIFICATE OF WORD COUNT

Pursuant to Local Rule 7.3(d)(1), I hereby certify that this brief, including headings and footnotes, contains 6,187 words based on the word count feature of Microsoft Word, excluding the case caption and signature block.


Dated: July 6, 2026

/s/ S. Wilson Quick
S. Wilson Quick

25