Anthony I. Paronich, Pro Hac Vice to be filed
anthony@paronichlaw.com
PARONICH LAW, P.C.
350 Lincoln Street, Suite 2400
Hingham, Massachusetts 02043
Telephone: (617) 738-7080
Facsimile: (617) 830-0327

*Attorneys for Plaintiff and the Putative Class*

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| JUSTIN NELSON, individually, and on behalf of all others similarly situated,<br><br>*Plaintiff,*<br><br>v.<br><br>OVERBROOK LIFE LLC<br><br>*Defendant.* | Case No. 1:26-cv-00374-TDS-LPA<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT OVERBROOK LIFE LLC'S MOTION TO TRANSFER AND, IN THE ALTERNATIVE, MOTION TO DISMISS** |

This is a Telephone Consumer Protection Act ("TCPA") case brought under 47 U.S.C. § 227(c)(5) for unsolicited marketing text messages sent to a residential cellular number, 517-769-XXXX, that had been listed on the National Do-Not-Call Registry ("NDNCR") since November 2024. Defendant Overbrook Life LLC ("Overbrook") does not dispute that it sent the text messages at issue. Instead, it asks this Court to transfer this action to the Eastern District of Michigan and, in the alternative, to dismiss the case. None of Defendant's arguments have merit.

*First*, transfer to the Eastern District of Michigan is unwarranted. No valid arbitration agreement or forum-selection clause binds Plaintiff; Defendant's own exhibits show that the November 6, 2025 ScoredIt opt-in it invokes was completed using the name and address of a third party, on a webform that would not bind even its author to arbitrate, submitted to a company whose terms never name Overbrook as a party or beneficiary. And apart from arbitration, Defendant bears a heavy burden to displace Plaintiff's chosen forum that it has not carried by pointing to non-party witnesses whose entire contribution to this case have already collected and filed as exhibits, without ever needing Michigan's compulsory process. Defendant's own papers, moreover, concede that its operations are run out of Florida, not North Carolina or Michigan, undermining any suggestion that Michigan is genuinely more convenient for anyone.

*Second*, Defendant's contention that a text message is not a "telephone call" under Section 227(c)(5) is contrary to the overwhelming weight of authority, including repeated Ninth Circuit holdings to that effect, district courts within the Fourth Circuit's footprint

reaching the identical conclusion, the FCC's decades-old interpretation, and Congress's own 2019 ratification of that interpretation in the TRACED Act.

*Third*, Defendant's attack on Plaintiff's standing—built from a collection of pleadings filed in other lawsuits by Plaintiff's wife and a third party—does not defeat Article III standing here. The Fourth Circuit has squarely held that more than one person connected to a residential number may suffer a cognizable injury when that number receives unwanted solicitations, and nothing in Defendant's evidence forecloses Plaintiff's well-pleaded allegation that he is the subscriber who received Overbrook's texts.

*Fourth*, Defendant's argument that 517-769-XXXX was a business number rests entirely on a family member's connection to a small nonprofit that did not even exist until nearly a year after the number was already registered on the NDNCR, was run day-to-day by Plaintiff's wife rather than Plaintiff, and has since been assigned an entirely different phone number.

*Fifth*, Defendant's contention that Plaintiff was required to personally register 517-769-XXXX on the NDNCR has been rejected by nearly every court to consider it— including the very decision Defendant cites for the opposite conclusion.

For these reasons, and as explained further below, Defendant's Motion should be denied in its entirety.

<u>**BACKGROUND**</u>

Plaintiff alleges that Defendant transmitted unsolicited marketing text messages to cellular telephone number 517-769-XXXX, in violation of the FCC's Do-Not-Call regulations, 47 C.F.R. § 64.1200(c)(2). Compl. ¶¶ 20–31; Mot. at 1–2. Plaintiff alleges that 517-769-XXXX has been registered on the NDNCR since November 2024 and that he has been the subscriber of that number since June 2025, personally pays for the associated wireless plan, and does not use the number for business purposes. Mot. at 2 (citing Compl. ¶¶ 9–18); Nelson Decl. ¶¶ 2, 4, 7–8, 17–18.

Defendant has moved to transfer this action to the Eastern District of Michigan or, in the alternative, to dismiss the Complaint. In support of its Motion, Defendant submits the Declaration of S. Wilson Quick authenticating thirty exhibits. *See generally* Quick Decl.; Mot. Ex. A–DD. Defendant also submits the Declaration of Blaine Beichler, its Head of Operations, describing a November 6, 2025 online opt-in flow through which Defendant contends someone consented to receive its texts and to arbitrate any resulting dispute. Mot. at 7–9 (citing Beichler Decl. ¶¶ 10–41).

<u>**ARGUMENT**</u>

**I.     Defendant's Motion to Transfer Should Be Denied.**

Defendant's request to transfer this case to the Eastern District of Michigan rests on two independent premises, and both fail. First, Defendant contends that a November 6, 2025 online opt-in with a company called ScoredIt shows that Plaintiff, or someone he authorized, agreed to arbitrate this dispute and to a Michigan forum. No valid arbitration agreement or forum-selection clause binds Plaintiff, for the reasons set forth below.

Second, even apart from arbitration, Defendant has not carried its heavy burden under 28 U.S.C. § 1404(a) to show that transfer to Michigan would serve the convenience of the parties, the convenience of the witnesses, or the interests of justice.

**A. No Valid Arbitration Agreement or Forum-Selection Clause Binds Plaintiff.**

Defendant asks this Court to transfer this case to Michigan so that a factfinder there can determine whether the November 6, 2025 ScoredIt opt-in shows that "Plaintiff, or someone he authorized," agreed to arbitrate this dispute and consented to receive Overbrook's texts. Mot. at 2, 7–9. But the premise of that request collapses on Defendant's own exhibits: the opt-in was completed using the name and Jackson, Michigan address of Annette Ostrander—not Plaintiff. Beichler Decl. ¶ 41. Defendant does not, and cannot, allege that Plaintiff completed the opt-in himself. Even setting that threshold problem aside, the opt-in flow Defendant describes could not bind Plaintiff to arbitrate, and Overbrook is not a party to, or an intended beneficiary of, whatever agreement resulted from it.

### 1. ScoredIt's Opt-In Flow Fails the Conspicuousness Test Courts Apply to Webform Agreements.

Under the Federal Arbitration Act, "a written provision in… . . . a contract . . . to settle by arbitration a controversy thereafter… arising out of such a contract . . . shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. But "the FAA does not require parties to arbitrate when they have not agreed to do so." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.*, 489 U.S. 468, 478 (1989); *see also AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 346 (2011) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury*

*Constr. Corp.*, 460 U.S. 1, 24 (1983)). On a motion premised on an arbitration agreement, courts in the Fourth Circuit ask (1) whether a valid arbitration agreement exists; (2) whether the movant is entitled to invoke it; and (3) whether the dispute falls within its scope. *Hightower v. GMRI, Inc.*, 272 F.3d 239, 242 (4th Cir. 2001); *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 365 n.9 (4th Cir. 2012). The party seeking to compel arbitration "bears the burden of establishing the existence of a binding contract to arbitrate." *Austin v. Experience Info. Sols., Inc.*, 148 F.4th 194, 201 (4th Cir. 2025). And a nonsignatory may invoke an arbitration clause only where applicable law permits it to do so. *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 632 (2009).

Internet agreements are enforceable on an inquiry-notice theory only where "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action . . . that unambiguously manifests his or her assent to those terms." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022). Notice is conspicuous only if "displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it," and a "tiny gray font considerably smaller than the font used in the surrounding website elements" is "the antithesis of conspicuous." *Id.* Likewise, a click manifests assent only where the user "is explicitly advised that the act of clicking will constitute assent to the terms and conditions." *Id.* at 857–58.

Measured against that standard, Defendant's own description of the ScoredIt flow does not establish a valid agreement. According to Defendant, the consumer was

"presented with a screen that prompted them to enter their phone number and gave them the option to check a consent box and click 'Continue,'" where the adjacent language stated only that, by "selecting this box and clicking 'Continue,'" the user consented to calls and texts and "agree[d] to the [] Terms of Service (including dispute resolution via arbitration and waiver of class actions)." Mot. at 7–8 (quoting Beichler Decl. ¶ 22). The word "subsidiaries" was hyperlinked to a separate page listing Overbrook; the full Terms could be read only by clicking yet another hyperlink elsewhere on the page. *Id.* Nothing in Defendant's own account establishes that this checkbox language and its accompanying hyperlinks were displayed with the size, placement, and prominence *Berman* requires, or that the consumer was clearly told that clicking "Continue"—rather than checking the box—was what constituted assent to arbitrate. Materially indistinguishable opt-in flows, funneled through the identical "Unified Marketing Partners" network of subsidiary webpages, have been found inconspicuous and unenforceable on nearly identical facts. *Faucett v. Move, Inc.,* No. 2:22-CV-04948-ODW (ASX), 2024 WL 2106727 (C.D. Cal. Apr. 22, 2024), *aff'd,* No. 24-2631, 2025 WL 1112935 (9th Cir. Apr. 15, 2025); *Muhammad v. Rates VIP, LLC*, No. 25-cv-11862, 2026 WL 735253, at *4 (N.D. Ill. Mar. 16, 2026). At minimum, whether the ScoredIt flow satisfies *Berman*'s two prongs is a disputed factual question that Defendant—as the party bearing the burden—cannot resolve in its own favor on the present record. *Austin*, 148 F.4th at 201.

### 2. Overbrook Is Not a Party to, or an Intended Beneficiary of, Any Arbitration Agreement That May Exist.

Even if a valid agreement to arbitrate existed with someone, Overbrook could not enforce it. By Defendant's own account, Overbrook is never named in the body of the Terms of Service; it appears only on a separately hyperlinked list of "subsidiaries" of a different entity, Unified Marketing Partners. Mot. at 7–8; Beichler Decl. ¶¶ 26, 36. A nonparty may compel arbitration under an agreement only if it is an intended third-party beneficiary of that agreement. *Arthur Andersen*, 556 U.S. at 632. ScoredIt's own Terms specify that they are "construed, governed by and enforced under the substantive laws of the State of Texas." Beichler Decl., Ex. A § VII.a. Those Terms define "Our Companies"—the entities purportedly entitled to enforce the Terms—as ScoredIt's "unaffiliated companies, assigns, and brands that are owned by, licensed by, and/or partnering with ScoredIt." Beichler Decl. ¶ 36 (quoting Ex. A at 2). Nothing in that open-ended, catch-all definition reflects the kind of specific intent to benefit Overbrook in particular that third-party beneficiary status requires. Courts confronting identical arrangements—a lead-generation opt-in flow that hyperlinks to a separate list of "marketing partners" or "subsidiaries" distinct from the Terms of Service themselves—have held that appearing on that separate list does not establish third-party beneficiary status. *See Faucett*, 2024 WL 2106727, at *3 ("[T]he Terms and Consent form are two different documents. [Defendant] fails to demonstrate that the Consent Form and Terms constitute a single agreement or that the companies . . . list[ed] in the Consent Form are entitled to the arbitration rights under the Terms."), *aff'd*, 2025 WL 1112935, at *1–2 (9th Cir. 2025); *Muhammad*, 2026 WL

735253, at *4 (defendant "presents no evidence that in addition to being a 'marketing partner' it is also a 'subsidiary, affiliate, or agent'" of the lead generator, and therefore has not shown it is an intended beneficiary). This Court should reach the same conclusion: being listed as a "subsidiary" of a shell entity on a hyperlinked webpage separate from the Terms themselves does not make Overbrook an intended beneficiary entitled to compel arbitration.

For the reasons above, The ScoredIt opt-in is not dispositive of anything: it was completed by a third party, using that third party's own name and address, on a webform that would not bind even its author to arbitrate, submitted to a company whose Terms never name Overbrook as a party or beneficiary. There is no need to transfer this case to Michigan to develop a factual record on an arbitration theory that fails on the face of Defendant's own exhibits.

### B. Transfer Would Not Serve the Convenience of the Parties, the Convenience of the Witnesses, or the Interests of Justice.

A court may transfer venue under Section 1404(a) only where "(1) the action originally could have been brought in the transferee court; (2) a transfer serves the convenience of the witnesses and parties; and (3) a transfer serves the interests of justice." *Gemini Drilling & Found., LLC v. Balfour Beatty Constr., Inc.*, 2004 U.S. Dist. LEXIS 5300, at *2 (M.D.N.C. Feb. 20, 2004) (citing 28 U.S.C. § 1404(a)). Relevant factors include the "relative ease of access to sources of proof; . . . availability of compulsory process for attendance of unwilling witnesses, and the cost of obtaining attendance of willing and unwilling witnesses; . . . practical problems that make a trial easy, expeditious, and

inexpensive; . . . [and] local interest in having localized controversies settled at home." *Speed Trac Techs., Inc. v. Estes Express Lines, Inc.*, 567 F. Supp. 2d 799, 802 (M.D.N.C. 2008). Defendant, as the movant, bears the burden of showing that these factors clearly favor transfer, and a plaintiff's chosen forum is "entitled to respect and deference," particularly where, as here, that forum has a genuine connection to the case. *Davis v. Stadion Money Mgmt., LLC,* No. 1:19CV119, 2019 WL 7037426 at *3 (M.D.N.C. Dec. 20, 2019).

### 1. *Defendant's Own Papers and its Choice to Organize as a North Carolina LLC Undercut Its Convenience Argument*

Defendant does not contend that North Carolina is inconvenient because its operations are elsewhere and it merely happens to be organized here; rather, Defendant's papers affirmatively disclaim any connection between this District and Overbrook's business at all, asserting that Overbrook "primarily operates in Florida," sent the texts at issue "from Florida," and keeps the person "overseeing Overbrook's texting campaigns" and its "relevant business records" in Florida. Mot. at 14 (citing Beichler Decl. ¶¶ 2, 4, 44–46). Yet Defendant does not ask this Court to send the case to Florida. It asks instead to send the case to the Eastern District of Michigan—a forum with no more connection to Overbrook's own conduct, witnesses, or records than North Carolina has, by Defendant's own account. Whatever the merits of Defendant's complaint about this District's connection to the case, Michigan does not solve it: on Defendant's own telling, none of Overbrook's employees, decision-makers, vendors, or records are located in Michigan either. *See* Beichler Decl. ¶¶ 2, 44–46.

That gap is telling. Section 1404(a) exists to serve "the convenience of parties and witnesses," 28 U.S.C. § 1404(a), yet Defendant identifies no witness employed by, or record custodian working for, Overbrook itself who is located in Michigan. The witnesses Defendant does identify—Michele Nelson, Annette Ostrander, and Lisa and Richard Rice—are, without exception, non-parties whose only connection to this case is information Defendant's own counsel has already obtained and filed as thirty exhibits: Facebook and Instagram posts, business-registry printouts, and complaints filed in other courts. *See* Quick Decl. ¶¶ 3–32; Mot. Exs. A–DD. None of that record required Michigan's compulsory process to assemble, and Defendant does not explain what additional, non-public testimony from these individuals would require a Michigan courtroom rather than a deposition notice. Generalized assertions about the convenience of non-party witnesses, without identifying what unique, non-cumulative testimony they would offer that cannot otherwise be obtained, do not carry Defendant's burden.

Defendant chose to organize Overbrook Life LLC under North Carolina law, and by its own admission, that formation is the only connection Defendant is willing to concede between this District and the case. Mot. at 14. Having availed itself of North Carolina law to bring itself into existence as a legal entity, Overbrook cannot now claim that defending a suit in the courts of that same state is so inconvenient as to warrant sending the case to a third forum where none of its own operations are located.

## 2. *Ease of Access to Proof Does Not Favor Transfer.*

Modern litigation technology makes the location of documentary evidence largely irrelevant to a transfer analysis, particularly where, as here, the bulk of the evidence Defendant relies upon consists of public social-media posts, business-registry listings, and court filings equally accessible from any district. *See generally Metz v. U.S. Life Ins. Co. in City of New York*, 674 F. Supp. 2d 1141, 1149 (C.D. Cal. 2009). To the extent any additional discovery is needed from Ms. Ostrander, the Rices, or Mrs. Nelson, Defendant does not explain why deposition testimony—available regardless of where the case is venued—would be inadequate.

## 3. *Plaintiff's Choice of Forum Is Entitled to Deference.*

Plaintiff filed this action in the district of Defendant's own state of organization. That is not forum shopping; it is precisely the sort of forum choice Section 1404(a) is designed to protect, particularly where, again by Defendant's own admission, Defendant's own forum of actual convenience (Florida) is not even the forum to which Defendant seeks transfer. A plaintiff's forum choice is entitled to deference unless private and public interest factors clearly point toward an alternative forum, and Defendant has identified no such showing here—only an alternative forum, Michigan, that is, on Defendant's own account, no more connected to Overbrook's conduct than North Carolina.

For these reasons, Defendant has shown neither that a valid arbitration agreement or forum-selection clause binds Plaintiff nor that it has carried its burden under Section 1404(a).

## II. Defendant's Motion to Dismiss Should Be Denied.

Defendant alternatively moves to dismiss the Complaint on four independent grounds—that a text message is not a "telephone call" under Section 227(c)(5); that Plaintiff lacks Article III standing; that 517-769-XXXX was a business number; and that Plaintiff was required to personally register the number on the NDNCR. Mot. at 2–3, 14–24. Each ground fails.

### A. "Call" Includes Text Messages Under Section 227(c)(5).

Defendant contends that a text message is not a "telephone call" under Section 227(c)(5). Mot. at 18–23. The Supreme Court, every circuit to consider the question, and the majority of district courts—even after *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146 (2025)—disagree. *See Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 156 (2016) ("A text message to a cellular telephone, it is undisputed, qualifies as a 'call.'"); *Barton v. Temescal Wellness, LLC*, 525 F. Supp. 3d 195, 198 (D. Mass. 2021) ("The Supreme Court ratified the FCC's interpretation that a text message was a call for the purposes of the TCPA in *Campbell-Ewald*[.]"). As the Fourth Circuit has explained in the closely related Do-Not-Call registry context, "[t]he Do-Not-Call registry stands out as a model of clarity. It means what it says. If a person wishes to no longer receive telephone solicitations, he can add his number to the list. The TCPA then restricts the telephone solicitations that can be made to that number." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 649 (4th Cir. 2019), *cert. denied*, 140 S. Ct. 676 (2019). Nothing in that model of clarity turns on whether a prohibited solicitation arrives as a voice call or a text message, and every court within the Fourth Circuit to address the question has agreed.

### *1. The Plain Meaning of "Call" Includes Text Messages.*

The contemporaneous meaning of "call" refer[s] to an attempt to communicate by telephone"—a definition that plainly includes text messages, which are "a form of communication used primarily between telephones." *Howard v. Republican Nat'l Comm.*, 164 F.4th 1119, 1123–24 (9th Cir. 2026) (quoting *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 953–54 & n.3 (9th Cir. 2009)). The Ninth Circuit reaffirmed that conclusion earlier this year under de novo review, without relying on *Chevron* deference. *Howard v. Republican Nat'l Comm.*, No. 23-3826, 2026 WL 90273, at *3–4 (9th Cir. Jan. 13, 2026).

Earlier this year, the Southern District of Texas addressed this same threshold question and answered yes, explaining that the "true problem" is not statutory ambiguity, but that "technology has done more to change [telephones] than [Congress] has done to change § 227(c)(5)." *Alvarez v. Fiesta Nissan, Inc.*, 2026 U.S. Dist. LEXIS 1415, at *8–9 (S.D. Tex. Jan. 26, 2026). Applying ordinary-meaning principles anchored to 1991 usage, *Alvarez* held that the "capacious" definition of "call" plainly reaches text messages, and rejected the notion that modern speakers' tendency to distinguish "calls" from "texts" narrows a statutory term fixed at enactment. *Id.* at *9–13 (citing *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998)). Had Congress meant to restrict Section 227(c)(5) to audible communications, "it would have used the phrase 'voice call,' rather than 'telephone call.'" *Taha v. Momentive Software, Inc.*, No. 8:25-cv-02330-DOC-JDE, 2026 U.S. Dist. LEXIS 54376, at *7–8 (C.D. Cal. Mar. 11, 2026) (cleaned up).

### 2. Section 227(c) Prohibits Unwanted Telephone Solicitations of All Kinds, Including Text Messages.

The core of Section 227(c) prohibits "telephone solicitations" to numbers on the Registry, 47 U.S.C. § 227(c)(1), (3)(F), and defines a "telephone solicitation" to mean "the initiation of a telephone call or message . . . which is transmitted to any person," *id.* § 227(a)(4) (emphasis added)—a definition that plainly encompasses text messages independent of the word "call" standing alone, since contemporaneous definitions of "message" embraced "[a]ny notice, word, or communication, no matter the mode and no matter how sent." *Message*, Black's Law Dictionary (6th ed. 1990). The statute's focus is the commercial purpose of the communication, not its form, and "a voice message or a text message are not distinguishable in terms of being an invasion of privacy." *Satterfield*, 569 F.3d at 954. Section 227(c)(5)'s private right of action for a "person who has received more than one telephone call . . . in violation of the regulations" is thus triggered by a telemarketing text sent in violation of those regulations, just as it would be by a voice call. *Krakauer*, 925 F.3d at 650 (describing the provision as "a straightforward provision designed to achieve a straightforward result").

### 3. Courts Within the Fourth Circuit Have Rejected Defendant's Argument, Including in Mey v. Liberty Home Guard.

Courts within the Fourth Circuit's footprint have repeatedly agreed that a text message is a "call" under Section 227(c)(5). *See Williams v. Myler Disability, LLC*, No. 3:20-cv-00275, 2020 WL 6693134, at *1 n.2 (W.D.N.C. Nov. 12, 2020); Order, *McGonigle v. Teleflora, Inc.*, No. 1:25-cv-00807-MSN-WEF (E.D. Va. Mar. 13, 2026), ECF No. 66.

Most directly, in *Mey v. Liberty Home Guard, LLC*, 2026 U.S. Dist. LEXIS 739, at *16–20 (N.D.W. Va. Jan. 5, 2026), the Court considered—and rejected—the same argument Defendant advances here: that text messages are not actionable under Section 227(c)(5). The court began with the statutory text, explaining that Section 227(c) regulates "telephone solicitations," which Congress defined to mean "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services." 47 U.S.C. § 227(a)(4) (emphasis added). The court emphasized that "[b]y explicitly including 'messages,' Congress made clear that the statute's protections extend beyond traditional voice calls," *Mey*, 2026 U.S. Dist. LEXIS 739, at *17, and that the Supreme Court has repeatedly treated text messages as "calls" under the TCPA. *See Campbell-Ewald*, 577 U.S. at 156; *Facebook, Inc. v. Duguid*, 592 U.S. 395, 400 n.2 (2021). The *Mey* court reasoned there is "no reason to assign the same word a different meaning in Section 227(c), given that both provisions protect the same core interest: the consumer's right to be free from unwanted intrusions." *Mey*, 2026 U.S. Dist. LEXIS 739, at *18.

The court also addressed the post-*Loper Bright* and post-*McLaughlin* landscape— the very authority Defendant invokes here, *see* Mot. at 18 n.13—concluding that the FCC's longstanding interpretation that texts qualify as calls remains entitled to "appropriate respect" where Congress expressly delegated authority, as it did in Section 227(c), and that the interpretation is "not an expansion of statutory text, but a reasonable implementation of Congress's mandate" to protect consumer privacy. *Id.* at *18–19. Applying ordinary-

meaning principles, the court further held that a call is "to communicate with or try to get into communication with a person by telephone," and that text messaging is indisputably communication by telephone—an analysis that applied "regardless whether deference to the agency's interpretation is appropriate or not." *Id.* at *19. Finally, the court grounded its reasoning in the TCPA's purpose: unsolicited text messages "invade the privacy and disturb the solitude of their recipients" in precisely the same way as voice calls. *Id.* at *20. *Mey* is squarely on point: it is the only post-*McLaughlin* decision within the Fourth Circuit to address this precise question, and it rejects the identical argument Defendant raises under the identical statutory provision at issue here. This Court should reach the same conclusion.

### 4. *Congress Ratified the FCC's Interpretation, and, In Any Event, the FCC's Interpretation Warrants Deference.*

Congress's own 2019 amendments confirm the point. When Congress passed the TRACED Act, it directed the FCC to prescribe regulations concerning "a call made or a text message sent in violation of" Section 227(b). 47 U.S.C. § 227(i)(1)(A) (emphasis added); Pallone-Thune Telephone Robocall Abuse Criminal Enforcement and Deterrence (TRACED) Act, Pub. L. No. 116-105, 133 Stat. 3274 (2019). By 2019, the FCC and every court to consider the issue had long interpreted "call" to include text messages; Congress is "presumed to be aware of" that interpretation and to have "adopt[ed] that interpretation when it re-enacts a statute without change." *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239–40 (2009). Where Congress has ratified an agency construction "with positive legislation," courts "cannot but deem that construction virtually conclusive." *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 846 (1986).

Even setting ratification aside, the FCC has held since 2003 that text messages constitute calls within the meaning of the TCPA, *In re Rules & Regs. Implementing the TCPA*, 18 FCC Rcd. 14014, 14115 ¶ 165 (2003), and Section 227(c) expressly delegates to the FCC the authority to decide how best to accomplish the statute's privacy-protection purposes, 47 U.S.C. § 227(c)(1)(A), (E). Courts have continued to defer to that interpretation even after *Loper Bright* and *McLaughlin*. *See, e.g., Mey*, 2026 U.S. Dist. LEXIS 739, at *18–19. At minimum, the FCC's longstanding interpretation of "call" is an "informed judgment to which [a court can] properly resort for guidance." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 388 (2024) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 139–40 (1944)).

### 5. *Defendant's Cases Do Not Withstand Scrutiny.*

Defendant leans heavily on *Stockdale v. Skymount Property Group, LLC*, No. 1:25-cv-1282, 2026 U.S. Dist. LEXIS 42954 (N.D. Ohio Mar. 3, 2026), and similar decisions, Mot. at 18 n.13, but those decisions cherry-pick isolated dictionary entries while ignoring the vast majority of contemporaneous dictionaries defining "telephone call" simply as a "call"—itself indifferent to voice or text. Tellingly, even the court in *Jones v. Blackstone Med. Servs., LLC*—one of the very decisions Defendant relies upon, *see* Mot. at 19—acknowledged that "[t]he Plaintiffs' position . . . that text messages are calls as the latter term is used in the TCPA . . . is an eminently reasonable one, particularly given the TCPA's purpose and the prevalence of text messaging in the U.S. today." No. 1:24-cv-01074-JEH-RLH, 2025 U.S. Dist. LEXIS 138371, at *14 (C.D. Ill. July 21, 2025). This Court should

follow the overwhelming weight of authority—including the only Fourth Circuit district court decisions to address the question post-*McLaughlin*—and deny Defendant's motion to dismiss Plaintiff's DNC claim on this ground.

### B.  Plaintiff Has Article III Standing to Pursue His TCPA Claim.

Defendant argues that Plaintiff lacks Article III standing because of allegations made in other lawsuits by his wife, Michele Nelson, and a third party, Annette Ostrander, and because Plaintiff's Complaint allegedly does not say that he personally "received" Overbrook's texts. Mot. at 14–17. Neither point defeats standing.

### 1.  *Plaintiff's Well-Pleaded Allegations that He Is the Subscriber of 517-769-XXXX Establish Standing.*

Plaintiff alleges that he has been the subscriber of 517-769-XXXX since June 2025, that he personally pays for the associated wireless plan, and that Overbrook's text messages were sent to that number after it was placed on the NDNCR. Compl. ¶¶ 9, 12, 19–20; Nelson Decl. ¶¶ 2, 4, 22, 25. At the pleading stage, those well-pled allegations must be accepted as true. Fed. R. Civ. P. 8(a)(2); *Iqbal*, 556 U.S. at 679.

### 2.  *The Fourth Circuit Has Squarely Held that More than One Person Connected to a Number May Suffer a Cognizable Injury from Unwanted Solicitations to that Number.*

Defendant's argument assumes that only one person—and, worse, only whichever person Defendant selects from a pool of intra-family pleadings—may possess a legally protected interest in a residential number. That is not the law. The Fourth Circuit has expressly recognized that "[i]f a wife, as the subscriber, lists a home telephone number on the Do-Not-Call registry, but her husband happens to be the one who receives the improper

calls . . . [b]oth the wife and the husband can suffer the harm that Congress sought to deter." *Krakauer v. Dish Network, LLC*, 925 F.3d 643, 647 (4th Cir. 2019). Other circuits agree. *See Hall v. Smosh Dot Com*, 72 F.4th 983, 988–90 (9th Cir. 2023) ("Nothing in our precedent or the text of the TCPA suggests that the owner of a cell phone must also be the phone's primary or customary user to be injured by unsolicited phone calls or text messages sent to its number . . . . [S]tanding is not exclusive. The fact that the primary or customary user of a phone may suffer a concrete injury from an unwanted call or text message does not preclude the phone's owner and subscriber from suffering the same."); *Leyse v. Bank of Am. Nat'l Ass'n*, 804 F.3d 316, 325–26 (3d Cir. 2015) (Congress's findings describe the persons protected by the TCPA using a variety of labels, including "residential telephone subscribers" and "receiving part[ies]"); *Binetti v. Colo. Tech. Univ., Inc.*, 2026 U.S. Dist. LEXIS 65158, at *11–12 (D. Or. 2026) ("[B]oth the owner/subscriber and the customary user of a cellular phone may be injured by, and therefore bring a claim against, unwanted telemarketer contact.").

Defendant itself supplies the binding authority defeating its own argument. It cites *Krakauer* for the proposition that Section 227(c)(5) provides a private right of action to the "person" who "received" the calls. Mot. at 11 (citing *Krakauer*, 925 F.3d at 656). But the very same opinion holds that a subscriber and a household user can independently satisfy that requirement for the same number. *Krakauer*, 925 F.3d at 647. Defendant cannot invoke *Krakauer*'s "recipient" language while ignoring *Krakauer*'s holding that more than one recipient can exist for the same number.

### 3. Defendant's Competing Allegations Present, at Most, Disputed Facts for Discovery—Not Grounds for Dismissal.

Defendant's real argument is not that no one associated with 517-769-XXXX has standing—it is that Defendant would prefer that person to be someone other than Plaintiff. But the materials Defendant has assembled do not resolve that question as a matter of law; they reflect that Plaintiff, his wife, and a third party have each, in one filing or another, described some connection to the same number over a period spanning more than a year. *See* Mot. at 4–6; Nelson Decl. ¶ 13. Sorting out the timing and nature of those overlapping connections—including whether, when, and for how long Ms. Ostrander retained any interest in 517-769-XXXX after the Nelsons allege they acquired it—is a factual question. It is not one this Court can or should resolve on a motion to dismiss based on competing inferences drawn from pleadings filed in other cases, particularly where Plaintiff has not yet had the opportunity to take discovery, including from Ms. Ostrander or Defendant's own vendor, ScoredIt, regarding who actually used 517-769-XXXX to complete the November 6, 2025 opt-in Defendant separately relies upon. *See supra* Section I.A.

Defendant's own theory, moreover, is internally inconsistent. Defendant contends in one breath that the November 6, 2025 ScoredIt opt-in—entered under Ms. Ostrander's name and address—shows that Plaintiff, or "another user" of the number, agreed to arbitrate this dispute, Mot. at 7–8, while contending in the next breath that this same evidence of Ms. Ostrander's continued association with the number undermines Plaintiff's claim to be its subscriber, *id.* at 15–16. Defendant cannot have it both ways. If Ms. Ostrander's connection to the number is recent enough to bind Plaintiff to an arbitration

clause he never signed, it cannot simultaneously be stale enough to strip Plaintiff of standing to sue over texts sent to the same number for the same reason.

### C. 517-769-XXXX Was Not a Business Number When It Received Overbrook's Texts.

Defendant argues that 517-769-XXXX was a business number and that 47 C.F.R. § 64.1200(c)(2)'s protections therefore do not apply. Mot. at 17–18. The current record does not support that conclusion.

Plaintiff's Complaint alleges that 517-769-XXXX "is used as a personal residential telephone number," that "[i]t is used for personal use only," and that it "is used primarily to communicate with friends and family." Compl. ¶¶ 13–15; Nelson Decl. ¶¶ 7–8. The Complaint further alleges that Plaintiff "has never had this [] number associated with a business" and has "never used this [] number in any business." Compl. ¶¶ 17–18; Nelson Decl. ¶¶ 17–18. Those well-pled factual allegations must be accepted as true at this stage. Fed. R. Civ. P. 8(a)(2); *Iqbal*, 556 U.S. at 679.

Defendant's own Statement of Facts confirms that the timeline works against it, not for it. 517-769-XXXX was placed on the NDNCR on November 13, 2024. Compl. ¶ 19. By Defendant's own account, Jackson County Hands United ("JCHU")—the nonprofit Defendant contends made the number a "business number"—"was operating in November 2025," and the earliest business-related use Defendant identifies, T-shirts advertised by Plaintiff's wife, Michele Nelson, dates only to September 2025. Mot. at 9 (citing Ex. V–X, Y–Z). Both dates postdate the number's residential NDNCR registration by nearly a

year. Nothing in Defendant's own exhibits suggests 517-769-XXXX was used for any business purpose, by anyone, before it was already registered as a residential number.

Nor is JCHU the sort of enterprise the business-number carve-out is aimed at. According to the very Chamber of Commerce listing Defendant relies upon, JCHU is categorized as a "Non-profit & Charitable Organization []" that provides "free resources, tree and recycling services" and was "starting up a wrestling camp." Mot. Ex. AA. And it is not Plaintiff whom Defendant's own evidence connects to that organization's public-facing activities: Mrs. Nelson is JCHU's "Executive Director/CEO," while Plaintiff is only its Treasurer. Mot. at 9 (citing Ex. U-V). Every T-shirt photograph and social-media post Defendant cites was authored by Mrs. Nelson, not Plaintiff. Mot. at 9–10. Defendant identifies nothing showing that Plaintiff himself, individually, ever held out 517-769-XXXX as a business line, as opposed to his wife's occasional use of a shared household number in connection with her own charitable project. Tellingly, once Plaintiff's counsel was alerted to this issue in an unrelated case, JCHU was migrated to an entirely different telephone number within weeks. Mot. at 9–10 (citing Ex. BB–DD).

At most, then, Defendant has shown that a residential number was, for some period, also referenced in connection with a family member's volunteer nonprofit work—not that Plaintiff used the number as a business line, let alone that he did so when Overbrook's texts were sent. That falls well short of the primary or exclusive business use necessary to strip a residential subscriber of the Registry's protections, and it is, at minimum, a disputed factual question that cannot be resolved against Plaintiff on the pleadings, particularly

where his own well-pled allegations say otherwise and no discovery has yet occurred. Fed. R. Civ. P. 8(a)(2); *Iqbal*, 556 U.S. at 679.

**D. Plaintiff Was Not Required to Personally Register 517-769-XXXX on the National Do-Not-Call Registry.**

Defendant argues that Plaintiff's DNC claim fails because he did not personally place 517-769-XXXX on the NDNCR before he became its subscriber. Mot. at 23–24. That argument has been rejected by nearly every court to consider it. The FCC's implementing regulation permits a "residential telephone subscriber" to register "his or her telephone number" on the Registry, 47 C.F.R. § 64.1200(c)(2), and ties no protection to whoever happened to hold the number at the moment of registration. Defendant's principal authority, *Rombough v. Robert D. Smith Ins. Agency, Inc.*, No. 22-CV-15-CJW-MAR, 2022 WL 2713278 (N.D. Iowa June 9, 2022), has been rejected as an "outlier" by the weight of authority. *See, e.g., Binetti v. Colo. Tech. Univ.*, No. 6:25-cv-01049-AP, 2026 WL 812365, at *4 (D. Or. Jan. 21, 2026). Indeed, even Defendant's own cited case, *Klassen v. Solid Quote LLC*, addressed "who did the registering" only as a class-certification concern, Mot. at 23 n.18 (quoting 702 F. Supp. 3d 1052, 1059 (D. Colo. 2023))—not as a pleading requirement for an individual plaintiff—and thus has no bearing on whether Plaintiff has adequately pled a claim here.

<u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant Overbrook Life LLC's Motion to Transfer and deny its alternative Motion to

Dismiss in its entirety. In the alternative, should the Court determine that any pleading deficiency exists, Plaintiff respectfully requests leave to amend.

Dated: July 13, 2026

<div style="margin-left:50%;">

PLAINTIFF, individually and on behalf of all others similarly situated,

**BY:** */s/ Anthony I. Paronich*
Anthony I. Paronich
M.A. State Bar No. 678437
**PARONICH LAW, P.C.**
350 Lincoln Street, Suite 2400
Hingham, MA 02043
Tel: (617) 485-0018
Fax: (508) 318-8100
anthony@paronichlaw.com

*Counsel for Plaintiff*

*/s/ Karl S. Gwaltney*
Karl S. Gwaltney
NC Bar. No. 45118
Maginnis Howard
7706 Six Forks Road, Suite 101
Raleigh, NC 27615
Tel: (919) 526-0450
Fax: (919) 882-8763
kgwaltney@carolinalaw.com

*Local Civil Rule 83.1(d) Counsel for Plaintiff*

</div>

<u>**CERTIFICATE OF WORD COUNT**</u>

Pursuant to Local Rule 7.3(d)(1), I hereby certify that this brief, including headings and footnotes, contains 6,243 words based on the word count feature of Microsoft Word, excluding the case caption and signature block.

Dated: July 13, 2026

<div align="right">

<u>*/s/ Anthony I. Paronich*</u>
Anthony I. Paronich

</div>

---